UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Fernanda GUZMAN,<br><br>                                    Plaintiff,<br><br>v.<br><br>Nancy A. BERRYHILL,<br><br>                                    Defendant. | Case No.:  17-cv-2593-CAB-AGS<br><br>**ORDER:**<br><br>**1. GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 13);**<br><br>**2. DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 21); AND**<br><br>**3. REMANDING TO THE SOCIAL SECURITY ADMINISTRATION FOR FURTHER PROCEEDINGS** |

        Plaintiff seeks disability benefits from the Social Security Administration. In finding that she did not qualify for those benefits, the Administrative Law Judge concluded that her diagnosis of Major Depressive Disorder did not have any limitation on her ability to work. But to arrive at that conclusion, the ALJ ignored the majority of the record, dismissed her treating physician, and relied on a consulting examiner who saw her before the onset of most of her symptoms. So plaintiff's motion for summary judgment must be granted and the case is remanded to the Social Security Administration for further proceedings.

1

**BACKGROUND**

**A. Factual Background**

In 2008, Plaintiff Fernanda Guzman was diagnosed with depression and prescribed Zoloft. (*See* R. 357-64, 502.) Her initial diagnosis followed her pregnancy, the loss of her child shortly thereafter, and the death of her mother, all in 2008. (*See id.* at 503, 506.) In 2010, she was evaluated by Dr. Romualdo Rodriguez, an examining psychiatrist hired by the Social Security Administration when it considered an earlier request for benefits. He diagnosed her with Post Traumatic Stress Disorder but concluded that so "long as [Guzman] is properly treated for depression and PTSD, she could easily recover from her symptoms in the next twelve months." (*Id.* at 507.) Accordingly, he determined that she was either "able" to complete or "slightly limited" in her ability to complete all work-related tasks. (*Id.*) After the initial treatment in 2008 and her appointment with Dr. Rodriguez, the record lacks mental-health treatment records until 2012, although it appears she at least intermittently took anti-depressant medication. (*See id.* at 505, 523, 702.)

In August 2012, Guzman complained to her doctor, Dr. Nicole Esposito, about worsening depression after she was forced to discontinue her Zoloft prescription due to an inability to afford it (apparently unaware that she could get it from her health insurer). (*See id.* at 702.) Guzman—whose physical conditions include uncontrolled diabetes—reported that there were days "where she doesn't inject insulin because she hopes that the high sugars will make her sick" and complained of "insomnia, poor concentration, poor energy and low interest." (*Id.*) Dr. Esposito restarted her Zoloft, diagnosed her with Major Depression, recurrent severe, and concluded that Guzman's GAF[1] was 45. (*Id.*) Also in

---

[1] The Global Assessment of Functioning is a 100-point mental-health scale for rating a patient's social, occupational, and psychological functioning, with 100 being the highest functioning and 1 the least. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir.

August 2012, Guzman met with Dr. Veronica Gutierrez, who provided counseling and diagnosed Guzman with "Major Depressive Disorder, Severe without psychotic features"

_____

2012) (citation omitted). The first, third, and last GAF ranges are relevant here; the rest are included only for comparison:

- **61-70**: **"Some mild symptoms** (e.g., depressed mood and mild insomnia), **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."

- **51-60**: "**Moderate symptoms** (e.g., flat affect and circumlocutory speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers)."

- **41-50**: "**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)."

- **31-40**: **"Some impairment in reality testing or communication** (e.g., speech is at times illogical, obscure, or irrelevant) **OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood** (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."

- **21-30**: **"Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communications or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., stays in bed all day; no job, home, or friends)."

*Id.* (citation omitted; boldfacing added).

3

and a "Phase of Life problem." (*Id.* at 682.) Dr. Gutierrez listed Guzman's GAF as 42, her prognosis as "Fair," and ordered Guzman to continue mental-health care. (*Id.* at 682-83.)

In September 2012, Guzman saw Dr. Esposito again and complained that she had seen no improvement to her depression. (*Id.* at 710.) Dr. Esposito switched Guzman from Zoloft to a 20 mg/day dose of Paxil. (*Id.* at 636, 710.) In October 2012, Dr. Esposito again saw Guzman for depression, and, although Guzman reported improvement, Dr. Esposito increased the Paxil dose to 40mg/day. (*Id.* at 652-53.) Dr. Esposito apparently downgraded Guzman's diagnosis to a moderate and recurrent version of major depressive disorder. (*See id.* at 653.) By her November appointment, Guzman reported improvements and despite "some days . . . still feeling depressed," her "crying spells" were "much better." (*Id.* at 634.)

In late December 2012, Guzman overdosed by taking handfuls of Vicodin, ibuprofen, and paroxetine, among others. (*Id.* at 523, 526.) This came about as a result of an argument she had with her family, although "medical problems and financial constraints" were also cited as contributors. (*Id.* at 514, 523.) She was discharged the next day after the 20 mg/day Paxil dose was "restarted," and she attended "several groups with perceived benefit." (*Id.* at 532.) Although she "demonstrated very poor insight into the seriousness of her suicide attempt," she reported feeling "good" and the hospital's doctor concluded her "suicidal ideation resolved, and she ceases to be a candidate for involuntary hold." (*Id.*) The hospital's physician diagnosed her with Major Depressive Disorder, recurrent severe. (*Id.* at 525.) Her GAF score upon admission was "20 to 25" but improved by discharge the following day to "50." (*Id.* at 532-33.)

From there, Guzman returned to mental-health treatment with Dr. Esposito and, on a few occasions, with Dr. Gutierrez. The course of treatment is summarized in the table below:

| Date | Complaints/Narrative | Diagnosis and Prescription | Record Pages |
|---|---|---|---|
| 12/31/2012 | "attempted to kill herself with pills," "did not plan this" | "major depression, mod[erate] recurrent" Increase Paxil to 40mg/day | 602-03 |
| 01/18/2013 | "doing much better," no "SI passive or active," "attending a mental health support groups three times a week," main focus "on her vivid dreams" | "major depression, mod[erate] recurrent" Paxil 40mg/day | 618-19 |
| 02/15/2013 | "very concerned about her nightmares," "suicide risk shows some improvement," "still with [occasional] SI and plans" | "major depression, mod[erate] recurrent" Increase Paxil 60mg/day "to target ongoing SI without intent." | 606-07 |
| 03/18/2013 | "much better with her depression," "rates her depression at a 4/10 (10 being severe)," "feels tired," but "much better motivation" | "major depression, partial remission" Paxil 60mg/day | 739-40 |
| 04/22/2013 (with Dr. Gutierrez) | "attempted suicide in December 2012," "would not have 'made it'" except "for her boyfriend" | "Major Depressive Disorder, Recurrent, Mild" "Phase of Life problem" "Parent-Child Relational Problem" | 872 |
| 5/10/2013 | "emotionally she feels she is doing well," "reports [overall] depression is much improved," "not had SI in many months" | "major depression, partial remission" "depression well controlled" Paxil 60mg/day | 866-68 |
| 07/12/2013 | "still feeling anxious and depressed," "very distressed by her dreams," "very anxious and very perseverative," "no SI," | "major depression, moderate recurrent" "Personality d/o NOS" "Anxiety, NOS" "uncontrolled anxiety and depression" decrease Paxil to stop over 3 weeks, begin Lexapro up to 10mg/day over the same period | 858-60 |

5

| | | | |
|---|---|---|---|
| 08/02/2013 | "is a little better than last visit with less depression and anxiety despite not being able to change meds," "stayed on the paxil," "no SI," "feeling less hopeless" | "major depression, moderate recurrent (with prominent anxiety)" "Personality d/o NOS" "improved control of depression" "d/c Paxil and direct switch to Lexapro 10mg" | 848-50 |
| 11/27/2013 | "overall she is much better," "depressed for briefer time periods 'maybe a few hours or a day at the most'," "same with suicidal thoughts" | "major depression, moderate recurrent (with prominent anxiety)" "Personality d/o NOS" "Improved with less interpersonal stressor" Paroxetine (Paxil) 60mg/day | 836-38 |
| 01/22/2014 | "much better," "doing fairly well", "severe nightmares" when she "forgets to take medication" | "major depression, moderate recurrent (with prominent anxiety)" "Personality d/o NOS" "Improved with less interpersonal stressor" Paxil 60 mg, "add hydroxyzine 50mg" | 920-22 |
| 01/27/2014 (with Dr. Gutierrez) | "Unhappy," "Depressed," "Fearful", "somewhat disheveled," "Abnormal" affect | "Major Depressive Disorder, Recurrent, Moderate" "PTSD" "Phase of Life problem" "Parent-Child Relational Problem" | 928-29 |
| 02/15/2014 (with Dr. Gutierrez) | "Frustrated," "Unhappy," "Depressed," "Abnormal" affect | "Major Depressive Disorder, Recurrent, Moderate" "PTSD" "Phase of Life problem" "Parent-Child Relational Problem" | 930 |
| 11/12/2014 | "re-establish of care," "nightmares have improved," "still feeling depressed about her medical conditions," "crying spells nearly daily, | "Moderate recurrent major depression" "Personality d/o NOS" "return of depression in the context of trouble with medication compliance" | 1066-68 |

6

| | | | |
|---|---|---|---|
| | energy is poor," "no current SI" | Paxil 60mg/day | |
| 02/06/2015 | "Re-establish of care," "feeling worse," "good friend[] committed suicide 6 weeks ago," "not making plans" to carry out any SI | "Moderate recurrent major depression" "Personality d/o NOS" "again return of depression in the context of good friend having suicide attempt also off medications 1 week (though depression returned while she was taking her medications)" "restart" Paxil stepping up to 60mg/day | 1057-59 |
| 06/24/2015 | "Re-establish of care," "son was attacked," "stopped her medication" b/c "busy," "restarted her meds," "bad dreams have come back," "mood is slightly better but still with fatigue," "mild dec[reased] interest," "dec[reased] appetite" | "Moderate recurrent major depression" "Personality d/o NOS" Restart Paxil stepping up to 60mg/day, hydroxyzine 25 mg, as needed | 1042-44 |
| 08/17/2015 | "restarted the medication," "doing well," "depression is somewhat better," "anxiety and 'worry all the time,'" "uses hydroxyzine" for anxiety and "it is effective" | "Moderate recurrent major depression" "Personality d/o NOS – very reactive interpersonally" "Improved depression ongoing mild anxiety" Paxil 60mg/day | 1034-36 |
| 10/03/2015 | "good days and bad days," "hydroxyzine is very effective for anxiety," "struggling with vivid dreams," "fleeting and passive SI (no active)" | "Moderate recurrent major depression" "Personality d/o NOS – very reactive interpersonally" "ongoing depression some improvement but not at partial remission yet" Paxil 60 mg/day, hydroxyzine 50mg as needed, prazosin 1mg at bedtime | 1031-33 |

After that final appointment in the record, Guzman mentioned to the doctor she saw for her physical ailments that her depression had gotten "worse" and that she was "crying frequently." (R. 1028.)

In addition to those records, Dr. Esposito wrote two letters setting out her thoughts on Guzman's prognosis. On March 26, 2014, she wrote in relevant part that Guzman "initiated care in August of 2012 for depression. Her depression worsened over time and was not responding well to medication. . . . Since her worsening depression, she [] has been unable to return to work due to complex medical and mental health problems." (*Id.* at 948.) On January 11, 2016, Dr. Esposito indicated that her physical ailments have "been a contributing factor[] in her persistent depression. She has had on and off suicidal ideation and even had a suicide attempt and psychiatric hospitalization in Dec 2012." (*Id.* at 1102.) She concluded that the "combination of physical and mental health illness have rendered her disabled from work despite her coming to visits and adhering to treatment recommendations." (*Id.*)

**B. Procedural Background**

In late 2012, Guzman filed an application for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act. (*See* R. 229-41.) After being denied at the initial and reconsideration stages, (*see id.* at 74-89, 108-26), she argued to an Administrative Law Judge that her physical conditions—including vision problems, uncontrolled diabetes, and arthritis—coupled with her mental illnesses required a finding that she was disabled. The ALJ assessed some limitations as a result of her physical conditions, but concluded that her depression "does not cause more than minimal limitation in [Guzman's] ability to perform basic mental work activities and is therefore nonsevere." (*Id.* at 28.) So, in considering her capacity to work, the ALJ concluded that Guzman could "perform the work-related mental activities required by competitive, renumerative work" and rejected the notion that she suffered any restriction as a result of her depression. (*Id.* at 29.) The ALJ specifically rejected the opinions of Dr. Esposito and her treatment records.

8

Ultimately, the ALJ concluded that Guzman had the capacity to do jobs like dining room attendant and hospital cleaner, and thus she did not qualify as disabled. (*See id.* at 35.) After the Administration's Appeals Council declined to hear Guzman's appeal (s*ee id.* at 1), the ALJ's opinion became the agency's final decision and Guzman appealed that decision to this Court. In her appeal, Guzman argues that the ALJ erred by (1) failing to conclude her depression and other mental illnesses were severe, (2) failing to consider whether Guzman qualified for a disability determination by comparing her impairments to several "Listings" of disabling conditions, (3) ignoring the opinions of her treating physicians, (4) concluding she was able to do heavier work than she had previously done despite finding she could no longer do that past work, and (5) failing to support his conclusions about her capacity to work with substantial evidence. She requests that this Court reverse the ALJ's decision and order immediate benefits or, in the alternative, remand the case for further proceedings. Because the Court concludes the first and third issues dispose with this appeal, it does not address the remainder.

## DISCUSSION

### A. Dr. Esposito's Opinions

In considering her mental illnesses, the ALJ rejected the opinions of Dr. Esposito. "If a treating physician's opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight.'" *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citation omitted). When, as here, the treating physician's opinion is contradicted by another doctor, an ALJ may only reject the treating physician's opinions by "providing specific and legitimate reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citations omitted). "Substantial evidence" is less than a preponderance of the evidence but more than a scintilla; it "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," but must be reviewed as a whole in the context of the entire record. *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).

If the ALJ chooses not to give the treating physician's opinion "controlling weight," the judge must decide what weight to give it after "consider[ing] all of the following factors":

- length of the treatment relationship and the frequency of examination;
- nature and extent of the treatment relationship;
- supportability (whether the medical opinion includes "supporting explanations" and "relevant evidence," particularly "medical signs and laboratory findings");
- consistency with the record as a whole;
- specialization (whether the opinion relates to the doctor's specialty); and
- any "other factors."

20 C.F.R. § 404.1527(c)(2)-(6). Although an ALJ need not explicitly go through the list of regulatory factors, there must be some indication that he considered each in his analysis. *See Trevizo v. Berryhill*, 871 F.3d 664, 676 (9th Cir. 2017); *Hoffman v. Berryhill*, No. 16-cv-1976-JM-AGS, 2017 WL 361881, at *4 (S.D. Cal. Aug. 24, 2017) ("*Trevizo* does not demand a full-blown written analysis of all the regulatory factors, it merely requires some indications that the ALJ considered them.") *report and recommendation adopted by* 2017 WL 4844545 (S.D. Cal. Sept. 14, 2017). Here, the ALJ did not mention or provide any indication that he considered the first two categories or any specialization Dr. Esposito—a psychiatrist—had in the treatment of depression and mental health. "This failure alone constitutes reversible legal error." *See Trevizo*, 871 F.3d at 676. But even if the Court were to look past this error, the ALJ's stated reasons[2] for rejecting Dr. Esposito's opinions do not rise to the "specific and legitimate" level.

---

[2] In its brief before this Court, the United States adds additional reasons the ALJ could have, but did not, mention in rejecting Dr. Esposito's opinions. (*See, e.g.*, ECF No. 21, at 13 (arguing that the ALJ could have rejected Dr. Esposito's opinion as contrary to Guzman's activities of daily living).) But the Court is restricted to the stated reasons offered by an agency for its action, and thus does not consider these additional reasons

## 1. Physical Conditions as Contributing Factor

First, the ALJ rejected Dr. Esposito's opinions because "[t]he evidence does not support [her] assertion that [Guzman's] physical conditions were a contributing factor to [Guzman's] persistent depression, but hospital records showed that [Guzman] took pills only after an argument with her family." (R. 33.) This statement does not track with any reasonable reading of the record. The hospital records on which the ALJ relies specifically note that she had been "stresse[d] out about bills, family problems, and her own medical issues" at the time of her suicide attempt. (*Id.* at 514; *see also* 523 ("Stressors include numerous medical problems, and financial constraints."); 526 ("The patient had an argument with the family, has had a lot of financial stressors, family problems, and a lot of medical issues, and she just wanted to end it all.").) So the first support the ALJ points to for this statement does not support it.

The ALJ also rejected Dr. Esposito's statement about Guzman's contributing physical conditions because, at the time of her suicide attempt, Guzman "had been noncompliant" with her medications and when "restarted," her "suicidal ideation resolved." (*Id.* at 33.) Again, no reasonable reading of the record supports this conclusion. Although there is evidence in the record that Guzman was periodically noncompliant with her psychiatric medication, there is nothing in the record to suggest Guzman was noncompliant at the time of her suicide attempt, other than the fact that she took "a couple of Paxil" along with the other drugs in her attempt to kill herself. (*See id.* at 523.) Indeed, her treatment plan from the hospital was to "[c]ontinue Paxil 20mg." (*Id.* at 525.) The closest the hospital notes come to indicating noncompliance is in the discharge summary, where it mentions she was "restarted on Paxil 20 mg by mouth daily," (*id.* at 532), but there

_____

offered for the first time here on appeal. *See Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) ("We review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely.").

is nothing in that which suggests she was noncompliant with her previous 40 mg dose of Paxil prior to her suicide attempt. Instead, Dr. Esposito's notes indicate a few days later that she had "good" adherence to her psychiatric medications, (*see id.* at 602), and Dr. Esposito's notes are the only reason the record indicates any periods of noncompliance, albeit at different times from her suicide attempt. (*See, e.g.*, *id.* at 1042 (6/24/2015 Note: "trouble with adherence on/off has been back on for appox 4 weeks").) So this ground also does not serve as a legitimate or specific reason to reject Dr. Esposito's conclusion that Guzman's physical conditions contributed to her depression, much less to reject her opinions en masse.

Indeed, Guzman's other medical records repeatedly tie her physical conditions to her mental-health treatment. (*See, e.g.*, *id.* at 702, 866, 872, 928, 930, 1057, 1066.) In short, then, no reasonable reading of the record supports rejecting Dr. Esposito's opinions because she opined that Guzman's physical conditions were a contributing factor to her depression.

*2. Impaired Eyesight*

In her 2016 statement, Dr. Esposito wrote that Guzman "had many secondary consequences of diabetes with damage to her vision which has limited her employment options." (*Id.* at 1102.) The ALJ faults that line from Dr. Esposito because it was "wholly inconsistent with the hospital records that showed that the claimant continued to drive despite impaired eyesight." (*Id.* at 33.) The ALJ's reasoning is not supported by substantial evidence in the record.

The 2012 hospital records indicate that Guzman had been driving despite her "markedly impaired eyesight"; in fact the hospital staff reported her to the DMV and child protective services as a result. (*Id.* at 532.) There is nothing in the hospital records that is "wholly inconsistent" with Dr. Esposito's opinion that Guzman had impaired vision or that, in Dr. Esposito's opinion, Guzman's impaired vision impacted her ability to work. Instead, the record is clear that Guzman has substantial vision impairment and every doctor— including both of the original consulting doctors for the Social Security Administration

(*see id.* at 87, 120)—assessed Guzman occupational limitations as a result of her vision impairment. Although the ALJ is free to ultimately disagree with Dr. Esposito as to the impact of Guzman's eyesight limitations or her opinion on whether Guzman is ultimately disabled, *see Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008), *every* doctor to review her medical records concerning her visual impairments agreed with Dr. Esposito that Guzman had "damage to her vision" as a "secondary consequence[] of diabetes" and thus faced "limited" "employment options." (*See* R. 1102.) So it is not legitimate to discount Dr. Esposito's opinion simply because she made a statement which agreed with every other doctor on the record, at least not where the ALJ failed to cite to substantial evidence to support rejecting that conclusion.

### 3. Advocating for Guzman

Next, without explanation, the ALJ faults Dr. Esposito for "advocating for [Guzman] as well as assisting [Guzman's] attempt to obtain benefits, rather than simply providing medical treatment." (*Id.* at 33.) "An ALJ may not reject a treating physician's opinion based on the assumption that a treating physician has a natural tendency to advocate for her patients but may do so if there is evidence that the physician is in fact acting as an advocate." *Hamlin v. Colvin*, No. CV 12—6369—JPR, 2013 WL 3708381, at *15 (C.D. Cal. July 12, 2013). Here, although Dr. Esposito opined unfavorably on Guzman's ability to work, in both letters she did it after explaining, at least in general terms, the basis for her belief. Indeed, in the 2016 letter which the ALJ appears to be referencing, she explained that Guzman's "financial and social stressor of not being able to support herself have limited her ability to recover from [her] deep depression" and therefore Dr. Esposito "believe[d] that having this social safety net w[ould] allow [Guzman] to focus on improving her health." (R. 1102.) Thus, Dr. Esposito's opinion is garden variety concern from a physician seeking the path most likely to help her patient recover from an illness. There is no evidence Dr. Esposito agreed to advocate on Guzman's behalf in a manner such that her objectivity was compromised or helped Guzman fill out any of her disability paperwork. *Cf. Hamlin*, 2013 WL 3708381, at *15 (and cases cited there). Accordingly,

13

without some explanation as to why the ALJ believed Dr. Esposito was engaged in objectivity-compromising advocacy, this ground is not supported by substantial evidence.

### 4. Failure to Make an Appointment

The ALJ's next basis for rejecting Dr. Esposito's opinions is perplexing. He states that "though Dr. Esposito indicated that treatment started in November 2013, the evidence indicated that the claimant was referred prior to that time and she failed to follow up until after the November 6, 2013 visit for physical complaints." (R. 34.) But the ALJ does not cite where Dr. Esposito made such a statement. It is not in her letters or the appointments surrounding that time; in both letters, she mentions that treatment began in 2012 and in the earlier letter included the greater specificity that it began in August 2012. (*See id.* at 948, 1102.). Nor does the ALJ make any sense of his statement given the long history of treatment with Dr. Esposito prior to November 2013. *See* table *supra*. In any event, whatever the ALJ meant by this basis, it is not supported by substantial evidence.

### 5. Dr. Rodriguez's Assessment

Finally, the ALJ gave "some weight" to Dr. Rodriguez's 2010 report which found that Guzman was only "slightly limited" or not limited at all in every mental-health aspect and concluded that so "long as [Guzman] is properly treated for depression and PTSD, she could easily recover from her symptoms in the next twelve months." (*Id.* at 507.) Although he does not explicitly suggest he is rejecting Dr. Esposito's opinions because of the tension between her conclusions and Dr. Rodriguez's conclusions, even if he had, Dr. Rodriguez's report would not serve as substantial evidence to reject Dr. Esposito's opinions. Although a well-supported opinion of an examining physician can be sufficient to be substantial evidence to reject a treating physician's opinion, here the ALJ's reliance on Dr. Rodriguez's 2010 report falls short. *See Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001).

Dr. Rodriguez's examination and report predates Guzman's documented mental health decline by more than two years. He did not treat or examine her after her 2012 suicide attempt or the periods of suicidal ideation that came afterwards. Likely because of

the time frame he met with her, he did not diagnose her with any depressive disorder, despite the fact that every doctor (the hospital's physicians, Dr. Guiterriez, and Dr. Esposito) to treat her from 2012 on diagnosed her with Major Depressive Disorder, in almost every case severe or moderate in intensity. *See Holohan*, 246 F.3d at 1206 (rejecting an examining physician's report whose diagnosis was "flatly contradicted" by the record and the treating physician). Finally, as in *Holohan*, Dr. Rodriguez's optimistic prediction that Guzman's mental health could recover with twelve months of treatment turned out to be demonstrably false, as the treatment history shows. *See id.* at 1206, 1206 n.7 (noting that the examining physician's prediction that symptoms would "remit within six months to a year" with proper treatment "was not borne out" as shown by treatment notes). So, even allowing that the ALJ may have implicitly relied on Dr. Rodriguez's dated report to reject Dr. Esposito's much more recent conclusions, this basis is also not a specific and legitimate reason supported by substantial evidence. *See id.* at 1207 (rejecting that an ALJ may rely on "the medical opinions of examining and reviewing physicians . . . to the exclusion of [a treating physician's] more recent opinion" concerning depression, especially where the treating physician "cared for [claimant] over a period of time and . . . provided an opinion supported by explanation and treatment records").

**B. The Severity Determination**

In a related issue, the ALJ also erred where he concluded Guzman's depression was not severe. When ruling on an application for benefits, the Administration uses a five-step process. *See Popa v. Berryhill*, 872 F.3d 901, 905-06 (9th Cir. 2017). The second and fourth steps are relevant here. At the second step, the ALJ must determine whether an impairment, or combination of impairments, is "severe." To show severity, the claimant's burden is slight. She is required only to show that the impairment has more than a minimal effect on her ability to work. 20 C.F.R. § 404.1521. In fact, because the Step Two inquiry is a "de minimis screening device used to dispose of groundless claims," an ALJ may reject a medically severe impairment only when that conclusion is "clearly established by medical evidence." *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) (alterations and citations

omitted). Then, at Step Four, the ALJ must evaluate the applicant's residual functional capacity—that is, "the most [work she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). At this stage, the ALJ is required to compile all impairments, whether severe or non-severe, and determine what impact they have on her ability to work. *See Webb*, 433 F.3d at 687. When reviewing a Step-Two severity determination, this Court must affirm the ALJ's conclusion so long as he offered "substantial evidence" as support. *Webb*, 433 F.3d at 687.

The ALJ failed to offer substantial evidence to support his conclusion Guzman's depression had only a minimal effect on her ability to work. First, the ALJ reasoned that when under the care of Paxil, Guzman's depression improved and her suicidal ideations resolved, and that she was noncompliant at times, including at the time of her suicide attempt. But that is not supported by a review of the records. As set out above, the ALJ's statements that she was noncompliant with her treatment plan at the time of her suicide attempt is not supported by substantial evidence. *See supra*.

But even reviewing the rest of the record, Guzman was frequently compliant with medication when her depression seemingly worsened. Leading up to her suicide attempt, she was initially placed on Zoloft in August 2012, but did not report any improvement for a month and so was switched to Paxil in September. (*See* R. 702, 710.) In October, she reported some improvement and the Paxil was increased, leading to further improvement in November 2012. (R. 652-54.) Despite this improvement and her increased Paxil prescription, Guzman attempted suicide about a month after reporting improvement. (*Id.* at 523.)

Indeed, even when her medications were increased after the suicide attempt, it took her months—from the suicide attempt in December 2012 until March 2013—before her doctor indicated that she was becoming stable and that her condition was in "partial remission." (*See* R. 739-40.) And then, after five months of apparent improvement, she had another decline in July 2013, (*see id.* at 858-60), before another period of apparent improvement. And then months later, albeit after several periods of non-treatment, she had

16

three more periods of decline. (*See id.* at 1066-68, 1057-59, 1042-44.) In many of her periods of decline, she was on a 40mg or 60mg/day dose of Paxil and was compliant with her medication. (*Compare id.* at 602 (12/31/2012: "good" compliance); 618 (1/18/2013: "good" compliance); 606 (2/15/2013: "good" compliance); 858 (7/12/2013: "good" compliance); *with* 1066 (11/12/2014: "she states: 'I forget 2-3 weeks'"); 1057 (2/6/2015: "been off her medications x 1 week"); 1042 (6/24/2015: "trouble with adherence on/off"). So the ALJ's contention that compliant treatment with Paxil by itself reduced her depression's impact to a no-more-than-minimal effect on her ability to work is not supported by the record. And even if the record bore out such a conclusion, the Ninth Circuit has repeatedly remarked that "it is a questionable practice to chastise one with mental impairment for the exercise of poor judgment in seeking rehabilitation" and that it is inappropriate to "punish the mentally ill for occasionally going off medication" especially if one can attribute part of the reason for noncompliance to the "underlying mental afflictions." *Garrison v. Colvin*, 759 F.3d 995, 1018 n.24 (9th Cir. 2014) (quotation marks omitted).

Next, the ALJ mentions that, in a single record for a May 2015 medical checkup, her normal doctor noted that a "[s]tandardized depression screening" yielded "no significant symptoms as indicated by a PHQ2 score that is less than 3." (R. 1048, *see also id.* at 28.) That is an accurate picture of that particular medical record. But "[c]ycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Garrison*, 759 F.3d at 1017. "Rather than describe [Guzman's] symptoms, course of treatment, and bouts of remission, and thereby chart a course of improvement," the ALJ improperly singled out a single test from a non-mental-health related visit to conclude that her depression would have no more than a minimal effect on her ability to work. *See id.* at 1018; *see also Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014) ("The fact that a person suffering from depression makes some improvement 'does not mean that the

17

person's impairment no longer seriously affects his ability to function in a workplace.'" (alterations and citations omitted)).

Finally, the ALJ noted that her activities of daily living were inconsistent with a severe mental illness. Specifically, he noted that she "continues to care for her special needs son"; "is able to perform routine household chores with assistance"; "goes to the casino three times a week with friends and plays the slot machines"; has "a good relationship with her family, relatives, friends, neighbors and others"; "runs errands, goes to the store, cooks and makes snacks"; "remains independent in self-care including dressing and bathing herself"; and "was able to leave home alone, handle her own cash and pay her own bills." (R. 29.) Some of this analysis is problematic, as the ALJ relies on older records for some of her capabilities—including the 2010 psychiatric evaluation—which contrasted starkly with her testimony at the hearing in this case. (*See, e.g.*, *id.* at 52 (discussing her special needs son, "[h]e practically . . . tak[es] care of me now"); 59 (testifying to "lots of problems with her [daughter] right now").) But more importantly, the Ninth Circuit has repeatedly warned about the dangers of considering a claimant's daily activities without the necessary context to determine if they truly rebut the claimed severity of an impairment. *See, e.g.*, *Trevizo*, 871 F.3d at 676; 682 ("[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." (quotation marks omitted)). Here, the ALJ did not explain how these relatively mundane daily activities make it so that her Major Depressive Disorder and her, at least occasional, daily crying bouts would have no more than a minimal impact on her ability to work. *See id.*

Finally, the Court notes that following her suicide attempt, every doctor who worked with her on mental health diagnosed Guzman with Major Depressive Disorder, with the severity typically being either moderate recurrent or severe recurrent. That diagnosis by itself is difficult to square with a finding that her depression is non-severe. *See O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016) (pointing out that it was "nonsensical" for the ALJ to "decide[] that 'major depression, recurrent severe' isn't a severe

18

impairment," since "the diagnosis, by definition, reflects a practitioner's assessment that the patient suffers from 'clinically significant distress or impairment in social, occupational, or other important areas of functioning.'" (citations omitted)); American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, *Major Depressive Disorder* (rev. 5th ed. 2013) ("DSM V") (requiring that the "symptoms cause clinically significant distress or impairment in social, occupational, or other important areas of functioning"). Even a "moderate" severity is required to be more than a "minor impairment in social or occupational functioning." DSM V, *supra*, *Specifiers for Depressive Disorders*. *See also O'Connor*, 832 F.3d at 897 ("We have not found a published opinion from any circuit in which an ALJ declared that major depression was not a severe impairment, although two unpublished decisions soundly reject this assertion.").

And so the ALJ erred here as well. But any error in "neglecting to list [an impairment] at Step 2" is harmless when the "ALJ extensively discussed [the claimant's impairment] at Step 4 of the analysis." *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (citation omitted). Other than the already rejected analysis of Dr. Esposito's opinions, the ALJ never mentioned Guzman's depression in his Step Four analysis and provided no limitations based on her depression. In passing during his Step Two analysis, the ALJ concluded that Guzman "has the mental residual functional capacity to perform work-related mental activities required by competitive, renumerative work," but provided no further discussion or analysis of her impairment to explain why. So the error here was not harmless.

## C. Remedy

"The decision whether to remand a case for additional evidence, or simply to award benefits, is within the discretion of the court." *Trevizo*, 871 F.3d at 682 (alterations and citation omitted). Courts generally remand for calculation of benefits when: (1) the record is "fully developed," (2) the ALJ failed to provide "legally sufficient reasons for rejecting evidence," and (3) crediting the rejected evidence as true, the ALJ would be required to

19

find the claimant disabled. *Id.* at 682-83 (citation omitted). But when "the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled," the court should remand for further proceedings. *Garrison*, 759 F.3d at 1021. "If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded for further proceedings." *Trevizo*, 871 F.3d at 682 (alterations and citation omitted).

The Court will remand this case for additional proceedings, rather than a calculation of benefits. First, the record is insufficiently developed. Although crediting Dr. Esposito's opinion might require that Guzman be found disabled, it is unclear *when* that disability would have begun. In order to be eligible for Title II benefits, Guzman must be found to have been disabled prior to November 7, 2012, while she would be eligible for Title XVI benefits regardless of when she became disabled. Since the ALJ here found that she was not disabled at any time from her application to the date of his decision, he did not parse out that question and the parties' supplemental briefing on the issue was not sufficient to allow the Court to decide the question in the first instance. (*See* ECF Nos. 25 & 26.)

Moreover, the Court is not convinced that the record is sufficiently clear as to whether Guzman is disabled to remand for direct calculation of benefits. Although the failure to include her depression as a severe mental impairment requires remand and the ALJ failed to give Dr. Esposito sufficient weight, there are contrary indications in the record that might still lead to a conclusion that she is not disabled. For instance, the Court notes that Guzman went long stretches of time without treatment, was labeled as a "no show" to many appointments, and failed to appear at a psychiatric evaluation in 2016 at the order of the Social Security Administration. (*See* R. at 1103 (noting Guzman failed to appear at a March 29, 2016 psychiatric evaluation).) The Court is particularly concerned about Guzman's failure to appear at the 2016 evaluation, as a neutral evaluation by a non-treating physician had not been done in six years. Guzman's failure to appear at that evaluation robbed from the Administration and the ALJ information that may have been

critical to its review of the record and the Court is disinclined to reward a claimant for failure to take part in the Administration's process.

And so the Court opts to return the entire case to the Social Security Administration for additional proceedings.

## CONCLUSION

Thus, the Court **GRANTS** Guzman's summary judgment motion (ECF No. 13), **DENIES** defendant's cross-motion for summary judgment (ECF No. 21), and **REMANDS** the case for additional proceedings.

Dated: December 20, 2018

_____
Hon. Cathy Ann Bencivengo
United States District Judge

21